UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **Q APARTMENTS DK A/S** | * | **CIVIL ACTION NO.** |
| | * | |
| | * | **SECTION** |
| | * | |
| **VERSUS** | * | **DISTRICT JUDGE** |
| | * | |
| **RODERICK THOMSON, MARSDEN** | * | **MAGISTRATE JUDGE** |
| **MILLER, MILLER THOMSON &** | * | |
| **PARTNERS, LLC AND MILLER** | * | **JURY DEMAND** |
| **THOMSON INC.** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

Plaintiff Q Apartments DK A/S respectfully alleges as follows:

## PARTIES

1.

Plaintiff Q Apartments DK A/S ("Q Apartments") is a stock company formed under the laws of Denmark. Its principal place of business is 13 New North Street, London WCIN 3JP, UK.

2.

Defendant Roderick Thomson ("Thomson") is a person of the full age of majority, domiciled in Dubai, United Arab Emirates.

3.

Defendant Marsden Miller ("Miller") is a person of the full age of majority, domiciled in Lafayette Parish, State of Louisiana.

4.

Defendant Miller Thomson Inc. ("MTI") is a corporation formed under the laws of Delaware. Its principal place of business is 301 E. Kaliste Saloom Road, Suite 301, Lafayette, Louisiana, 70508.

5.

Defendant Miller Thomson & Partners, LLC ("MTP") is a limited liability company formed under the laws of Delaware.  Its principal place of business is 301 E. Kaliste Saloom Road, Suite 301, Lafayette, Louisiana, 70508.

## JURISDICTION AND VENUE

6.

Defendants are liable to Q Apartments for violations of the Securities Act of 1933, 15 U.S.C. § 77a et seq; the Securities and Exchange Act of 1934, 15 U.S.C. § 78a et seq; the Louisiana Securities Law, La. R.S. 51:701 et seq; and intentional and negligent misrepresentation and conversion under Louisiana state law.

7.

Jurisdiction is proper under 28 U.S.C. §1331, as this is an action arising under the laws of the United States.

8.

Jurisdiction is proper under 28 U.S.C. §1332, as Plaintiff Q Apartments is a citizen of a foreign state and has its principal place of business in a foreign state.

9.

This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

10.

Venue is proper under 28 U.S.C. §1391, as three defendants are resident in this Judicial district and subject to the personal jurisdiction of this Court.  Furthermore, a substantial part of the events occurred, and substantial property at issue is situated, in the Western District of Louisiana.

## FACTS: THE Q APARTMENTS INVESTMENT

11.

Plaintiff Q Apartments hired Will Barroll Brown ("Brown") as a contractor and agent in or about the summer of 2017 for the purpose of representing it in potential investments and transactions. Brown was relieved of his duties and his business relationship with Q Apartments in or about February 2018.

12.

Thomson and Miller have been partners since 1981.  They are both prevalent, experienced and known worldwide as serious investors and developers in the oil & gas industry.  At all times relevant to this lawsuit, Thomson has been the Co-chairman of MTP.  At all times relevant to this lawsuit, Miller has been the Managing Director of MTP.

13.

Effective June 1, 2017, MTP entered into a Purchase and Sale Agreement ("PSA") with ConocoPhillips and Burlington Resources Oil & Gas Company LP (collectively "COP").  The PSA provided for COP to transfer a large number of oil & gas producing properties in the Barnett Shale to MTP in exchange for $305,000,000.00 (the "COP Transaction").

14.

The PSA was executed by MTP and COP on June 28, 2018, and on June 29, 2018, COP publicly announced the COP Transaction.  The closing date for the PSA was set for August 31, 2017.

3

15.

Brown had known Thomson and his family for a long time.  They had been doing business together for approximately 5 years, including large loans Brown arranged for Thomson which Thomson repaid.

16.

In July 2018, Thomson approached Brown and they discussed the COP Transaction. Thomson told Brown that his company, MTP, could offer an opportunity to invest in MTP's COP Transaction.  Any investment though would have to be done within a few days, as time was of the essence, since the COP Transaction was to be funded and closed imminently.  The terms of the investment instrument itself state: "Time is of the essence."  Ex. 1 at p.4.

17.

Brown, acting as agent for Q Apartments, believed Q Apartments might be interested and mentioned this to Thomson.  Thomson told him all financing to fund the COP Transaction was in place.  Furthermore, Thomson was known to Brown as a billionaire investor who could be trusted to personally pay the note if needed.  Thomson, being a friend and  with Brown, told him Q Apartments could get in on the deal by investing funds in MTP to be used for the purchase of the COP Barnett Shale assets.

18.

Thomson then put Brown in touch with Miller.  Miller told Brown essentially the same thing: that MTP all of the money was in place to fund the COP Transaction which would definitely close on August 31, 2017.

19.

Brown relayed these representations by Thomson and Miller to Q Apartments.  Brown told Q Apartments' Chairman, Kim Bøttger ("Bøttger") that he had done business with Thomson for many years, and Thomson was an honorable man and a billionaire whose representations could be trusted.

20.

A Facetime conference call meeting with Thomson, Brown and Bøttger followed soon thereafter.  This call was critical to Q Apartments given the short time frame available for the investment.  Thomson told Bøttger that the COP Transaction was fully funded, and that any money invested by Q Apartments would be used to purchase COP's Barnett Shale properties along with the rest of the secured $100 million in equity financing, and therefore all deadlines, including closing, would be met.  Thomson also let it be known he personally extraordinarily wealthy and Miller had a wealth of experience in the oil and gas industry.  Based upon the representations made by Thomson and Miller, Q Apartments agreed to loan MTP $3,000,000.00 via a convertible promissory note for the purpose of investing in the COP Barnett Shale properties.

21.

On behalf of Q Apartments, Brown negotiated the terms of the loan with Miller.  The result was a Convertible Promissory Note, dated July 28, 2017 (the "Note") for $3,000,000.00 with interest at 8% and a maturity date of December 31, 2017.  The Note is attached as Exhibit 1 to this Complaint.  Also included was an option for Q Apartments to convert the Note into equity at a price equal to 80% of the equity price of the other investors.  Bøttger, on behalf of Q Apartments, and Miller, on behalf of MTP, executed the Note on July 28, 2017.  Q Apartments recognized that as with any investment in oil and gas properties would be risky, and due diligence on the Barnett Shale assets

would be conducted during the months leading up to December 31, 2017.  Q Apartments could then either convert the loan to equity or choose to be repaid principal plus accrued interest.

22.

Much later, Q Apartments learned that there were significant problems with the COP Transaction and the solvency of MTP.   As discussed in detail *infra*, it turned out that very little financing had been secured at the time Thomson talked to Brown and Bøttger.  Contrary to Thomson's and Miller's representations, less than 10% of the financing necessary to close the COP Transaction was in place when the Note was executed.

23.

Had Brown, Bøttger and Q Apartments known that the funds were not in place to close the COP PSA, Q Apartments would never have made the loan to MTP.  If they had known the investment of $3,000,000.00 was not to be used to invest in the COP Transaction, and instead was to be used improperly for other purposes, Q Apartments would never had made the investment.

24.

Also undisclosed to Q Apartments was the fact that MTP owed significant funds to other lenders with interest accruing at a rapid pace.  As described in more detail *infra*, the reality turned out to be that the loan made by Q Apartments was not to be used for investment; it was squandered. Q Apartment's investment largely went to other lenders, past due accounts payable, and to Thomson and Miller personally.  In fact, the $3,000,000.00 loan never went to MTP at all.  Q Apartments wired the funds to MTI on July 28, 2017, but MTI never transferred the funds to MTP.

25.

It was never disclosed that not one cent of this money would ever go to any account of MTP. MTP was the signatory to the Note, and therefore liable for its default, yet the money resided with MTI and never with MTP.

26.

On the same day, July 28, 2017, that Q Apartment's loan was received by the bank for MTI, Defendants caused the following disbursements to be made by wire transfer:

| Recipient | Amount |
|---|---|
| Miller | $250,000.00 |
| Thomson | $250,000.00 |
| Silverray (MTP lender) | $500,000.00 |
| Century Ventures (MTP lender) | $520,000.00 |

The balance of the $3 million investment went to undisclosed past due accounts payable of MTP's vendors.  These payments show that Thomson, Brown and MTP purposely and affirmatively misled Q Apartments into believing it's investment of $3,000,000.00 would go directly toward financing the COP Transaction.

27.

MTP's venture failed and the closing of the COP Transaction never happened.   The December 31, 2017 maturity date passed and demand was made on MTP for payment of principal and outstanding interest.  MTP did not pay.

28.

A Petition on the Note was filed on January 12, 2018 in the 15th Judicial District Court, Parish of Lafayette, State of Louisiana.  On April 19, 2018, the Court rendered Judgment in favor of Q Apartments and against MTP for $3,234,633.33, which was inclusive of principal, interest and attorneys' fees at that time.  Interest continues to accrue.

## FACTS: THE UNDISCLOSED REALTIES OF MTP AND
## THE CONOCO TRANSACTION

29.

Undisclosed, hidden and misrepresented to Q Apartments, the realities of MTP's situation and amount of funding MTP had secured for the COP Transaction were far different than represented to Q Apartments.  The PSA required a $30 million deposit to be paid by MTP to COP by August 1, 2017. On June 26, 2017, Miller emailed Jeff Graves ("Graves"), Director of Acquisitions and Divestitures of COP, and acknowledged (a) MTP only had $20 million secured at that time, and (b), if the $10 million payment was not made by August 1, 2017, MTP would forfeit the $20 million deposit.

30.

On July 10, 2017, MTP had still not yet secured the additional $10 million for the deposit due on August 1, 2017.  On July 20, 2017, Miller wrote internally that he "hoped" that the $10 million would be in the next week.

31.

On July 31, 2017, three days after Q Apartments had invested $3 million. MTP still did not have the $10 million required for the deposit due COP on August 1, 2017.  MTP, having squandered all of Q Apartments' $3 million on Miller, Thomson, paying back other loans and past due accounts payable, was not able to use the $3 million of Q Apartments' investment as part of the $10 million deposit.  Defendants knew on and before July 28, 2017 that MTP would not have the $10 million to apply to the deposit.

32.

That same day, July 31, 2017, Miller told Graves that Thomson was responsible for getting the $10 million to COP on time and would do so forthwith.

33.

The $10 million deposit was not wired to COP on August 1, 2017.  This was not disclosed to

Q Apartments.  On August 2, 2017, Miller emailed Graves that Thomson was in the process of selling

securities in order to pay the $10 million deposit to COP.

34.

On August 3, 2017, Graves sent formal notice to MTP that it was in default of the PSA.  This

was not disclosed to Q Apartments.

35.

On August 4, 2017, Miller promised Graves that he would have the proof of the $10 million

in funds "any moment" and would then forward it to Graves.

36.

Over the next few weeks, Miller continued to make excuses to Graves why the $10 million

had not yet been wired.  Thomson was cc'd on many of these emails.

37.

On August 24, 2017, it became clear to Defendants that MTP would not be able to raise the

$10 million, much less the extra $80 million in equity and $200 million in debt that it would take to

close the COP Transaction.  This was not disclosed to Q Apartments.

38.

On August 30, 2017, Miller wrote internally, including to Thomson, that MTP would not be

able to pay the $10 million by August 31, 2017 and that COP could cancel the transaction and keep

the $20 million deposit made by MTP.  This was not disclosed to Q Apartments.

39.

Graves emailed Miller on September 3, 2017, and informed him that the delay would cause the purchase price to increase by approximately $4 million, thereby reducing the value of the investment in the COP Transaction.  This was not disclosed to Q Apartments.

40.

At some point in September 2017, MTP did finally wire to COP the $10 million deposit.  On September 14, 2017, MTP and COP executed an amendment to the PSA in which the closing date would be moved to September 29, 2017.  The amendment stated that COP reserved the right to terminate the PSA if the additional $70 million in equity financing and $200 million in debt financing was not wired to COP before closing.  The parties also agreed that should COP agree to extend the closing date if needed, MTP would pay an additional $4.375 million for each additional month after September that closing had to be moved back.  At the time, there was no evidence that MTP was remotely close to securing the additional $70 million in equity to close the COP Transaction in two weeks.  Neither had MTP secured $200 million in debt financing.  None of these facts were disclosed to Q Apartments.

41.

MTP was not able to close on September 29, 2017.  COP once again agreed to extend the closing date for an additional upward adjustment in the purchase price of $4.375 million.  Graves warned Miller that it might well terminate the deal it if the October 31, 2017 closing date was not met.  This was not disclosed to Q Apartments.

42.

On October 10, 2017, Miller emailed Brown to confirm that all debt and equity financing had been firmed up and that MTP would be able to close the COP Transaction on October 31, 2017.  Miller knew this representation was not true.  Miller also did not disclose to Q Apartments that COP

had the right to terminate the COP Transaction if that deadline was not met.  Miller also did not disclose that MTP had failed prior to secure any more than $20 million in equity financing or that Q Aparments' investment had not been used for that purpose and had instead been pilfered and squandered.

43.

Miller also wrote Brown, "I recognize that you have invested debt and that it will be paid regardless of whether closing occurs."  This was false.  Miller knew at the time that MTP was insolvent.  It was in and around this time that The Defendants were actively soliciting Q Apartments to invest more money with MTP.

44.

Miller wrote Brown on October 14, 2017 that that $225 million in debt had been committed. Miller knew this was false.   In an effort to mislead Q Apartments into believing the COP Transaction was going forward and the investment was as previously represented, Miller disingenuously offered personally to buy the Note from Q Apartments after he lied about having the $225 million in debt committed.  Miller made this "offer" to pretend the COP Transaction was proceeding and to try to convince Q Apartments to invest more.

45.

In a draft press release drafted on October 17, 2017 and scheduled to go out on October 31, 2017, COP would announce that it had "completed its previously announced transaction with an affiliate of Miller Thomson & Partners LLC to sell its Barnett assets for $305 million plus net customary adjustments."  (Emphasis added.)  None of the Defendants notified Q Apartments that MTP, the company in which Q Apartments invested, would not be buyer and owner of the Barnett

assets.  Upon information and belief, Q Apartments' investment was not carried over to the books of this "affiliate."

46.

As of October 20, 2017, MTP still was not close to securing the $70 million in equity and $220 million in debt needed to close the COP Transaction by October 31, 2017.  In fact, MTP had learned that to secure the debt, it would need an <u>additional</u> $35 million on its balance sheet.  This was not disclosed to Q Apartments.

47.

COP allowed, on or about October 30, 2017, another extension of the closing date to November 30, 2017; this required another $4.375 million upward adjustment to the purchase price.  Miller represented to Graves that MTP at that time that he had $130 million in equity and $221 million in debt financing "committed."  There exists no evidence this was true.  In fact, it was later confirmed in an email from Graves to Miller that the debt financing had not been achieved and the closing date would once again have to be moved back. These facts were not disclosed to Q Apartments.

48.

It became apparent to COP and Defendants that MTP would not be able to close the COP Transaction until the end of January 2018.  Graves informed Miller on November 30, 2017 that COP would consider granting a delay, but noted that MTP was in breach of the PSA and COP reserved its right to terminate the COP Transaction.  This was not disclosed to Q Apartments.

49.

On December 11, 2017, COP terminated the COP transaction under the terms of the PSA. The Defendants did not inform Q Apartments of this occurrence.

50.

The Note required the Defendants to notify Q Apartments of default of the Note, at which time Q Apartments could declare all unpaid principal and interest immediately owing.  Specifically, the Note required MTP to notify of default if MTP was "generally not, or be unable to, or admit in writing its inability to pay, or fail to pay, its generally as they become due."  Ex. 1 at p.3.  Therefore, in addition to the legal duties Defendants had to disclose material facts, Defendants also breached the explicit terms of the Note.  Had Q Apartments been notified of any of Defendants' omissions of material fact, set forth *supra*, dating back to the time of the execution of the Note, Q Apartments never would have invested $3 million with MTP.

51.

Before the termination, Q Apartments previously requested $1 million repayment on the Note, and Miller and Thomson agreed to pay it before December 31, 2017, the date of maturity of the Note.  Having had no notice given by the Defendants that COP had terminated the PSA, and based on Defendants' misrepresentations and omissions, Q Apartments had opted to leave $2 million invested.  On December 13 & 18, 2018, Brown emailed Miller and Thomson checking to see if the $1 million would be repaid.  None of the Defendants ever responded.

52.

Miller and Thomson have reiterated their intent to pay Q Apartments many times over the past 10 months.  Nothing has been paid.

**CAUSE OF ACTION NO. 1:**
**VIOLATION OF SECTION 10(b) OF THE SECURITIES**
**AND EXCHANGE ACT OF 1934 & RULE 10b-5**

53.

The instrument at issue is a convertible promissory note made for the purchase of substantial assets by MTP and the motivation to Q Apartments to invest was motivated by profit.  The Note was therefore an investment and a security.

54.

In soliciting the purchase of the security by Q Apartments, Defendants failed to accurately and completely disclose all material facts. This failure to adequately disclose all material facts was made with scienter, as, among many other things, Miller and Thomson sought to personally profit by converting $500,000 to themselves and misuse the investment. Q Apartments justifiably and reasonably relied on the representations and omissions of Defendants and it believed that it could trust the various Defendants in their representations to Q Apartments. Q Apartments would not have invested in the Note had it known of the misrepresentations and/or omissions being made by Defendants.   Defendants are thus liable for violations of Section 10(b) of and Rule 10b-5 promulgated pursuant to the Securities and Exchange Act of 1934, 15 U.S.C. 78a et seq. (the "'34 Act").

55.

Q Apartments is entitled to all appropriate damages, including but not limited to return of the purchase price, consequential damages, attorneys' fees, and interest as provided by law.

56.

The violations of the '34 Act and Rule 10b-5 are timely because they are being brought within one year of the date that Q Apartments knew, or reasonably should have known, of the alleged misrepresentations and within three years of the first purchase of the securities.

14

57.

Q Apartments conducted all reasonable due diligence in light of the circumstances and pressing time limitations, but the fraudulent and reckless misrepresentations and omissions of Defendants made it impossible or unreasonable for Q Apartments to uncover the actual facts relating to Defendants' misrepresentations.

58.

Miller and Thomson are controlling persons under law by virtue of their ownership and ability to control the actions of MTP and MTI, as its directors and officers.

59.

Defendants further conspired to violate the '34 Act for their personal enrichment and aided and abetted each other in the violations complained of herein.

<u>CAUSE OF ACTION NO. 2:</u>
<u>SECTION 12(a)(2) OF THE SECURITIES ACT OF 1933</u>

60.

Miller and Thomson were sellers of securities for the purpose of Section 12(a)(2). They actively solicited investments and personally took a cut of investments, as evidenced by Q Apartments' experience.

61.

The Note purchased by Q Apartments were not registered with the Securities Exchange Commission, and the solicitation and sale of the securities did not satisfy any exemption to the Securities Act of 1933.

62.

The solicitation and sale of the security was made by use of interstate mails, wires and other means of interstate commerce.

63.

The sale of the security was made through oral communications that included untrue statements of material fact and omitted to state material facts that were knowingly false or misleading.

64.

Q Apartments did not know of the untrue statements and omissions at the time it purchased the security.  It first learned of the untrue statements and omissions in the fall of 2018 during its efforts to collect on the judgment against MTP.

65.

The Defendants offered and solicited securities to the public for the purpose of raising money for the Conoco Transaction.  A substantial number of potential investors were directly solicited, and upon information and belief the number of people was greater, or perhaps far greater, than 50.

66.

Miller and Thomson, in making their false statements and omissions, intended to, and did, personally financially gain from Q Apartments investment and they each personally took $250,000 each from Q's investment.

67.

Section 12(a)(2) provides that a purchaser "may sue either at law or in equity . . . to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  In this instance, Q Apartments is entitled to the full amount of its investment, because it received no income from the security.

## CAUSE OF ACTION NO. 3:
## VIOLATION OF THE LOUISIANA SECURITIES LAW

68.

The acts and omissions complained of *supra* constitute violations of the Louisiana Securities Law, La. R.S. 51:701 et seq. CCM is entitled to all appropriate damages, including return of the purchase price, consequential damages, attorney's fees, interest, and any other relief appropriate under the circumstances.

69.

Miller and Thomson  are controlling persons under the Louisiana Securities Law.

## CAUSE OF ACTION NO. 4: FRAUDULENT MISREPRESENTATION
## (Louisiana Civil Code art. 1953)

70.

Miller and Thomson, as described *supra*, intentionally misrepresented material facts to, and intentionally omitted material facts from, Brown and Q Apartments.

71.

Miller and Thomson intended to deceive Q Apartments in order to secure a  $3,000,000.00 investment in MTP.

72.

Q Apartments justifiably relied upon Miller's and Thomson's misrepresentations.  There was a transaction announced publicly to which MTP was a party, and Miller and Thomson were both prominent oil & gas industry developers and investors with long histories of success.  Furthermore, Thomson took advantage of his long-term relationship with Brown to induce Q Apartments to loan MTP money.

17

73.

Q Apartments sustained damages in an amount to be proven at trial.  It has lost the entire amount of its loan, and cannot recover from MTP directly.  MTP apparently is a shell with no funds of its own, and MTI, Thomson and Miller actually control it.

## CAUSE OF ACTION NO. 5: NEGLIGENT MISREPRESENTATION
## (Louisiana Civil Code arts. 2315 & 2316)

74.

As described *supra*, Miller and Thomson supplied materially false information to Q Apartments.

75.

Miller and Thomson had a legal duty to supply correct information to Q Apartments, as they controlled MTP, which entered into a contract with Q Apartments.

76.

Miller and Thomson breached the duty owed to Q Apartments by omitting material facts as well affirmatively misrepresenting material facts.

77.

Q Apartments sustained a pecuniary loss as a result of its justifiable reliance upon the omissions and misrepresentations of Thomson and Miller.

## CAUSE OF ACTION NO. 6: CONVERSION (Thomson and Miller)

78.

Thomson and Miller personally possessed funds ($250,000.00 each) loaned from Q Apartments to MTP.

79.

The funds were removed from the possession of MTI and/or MTP to the accounts of Thomson and Miller with the intent they exercise control over the funds.

80.

The possession of the loaned funds by Thomson and Miller was not authorized.

81.

Possession of the funds is being withheld from Q Apartments, which has a judgment for the loaned funds.

82.

Thomson and Miller have asserted ownership of the funds by keeping them and not returning them to Q Apartments.

## CAUSE OF ACTION NO. 7: CONVERSION (Miller Thomson Inc.)

83.

MTI possessed funds ($3,000,000.00) loaned from Q Apartments to MTP.

84.

The funds were loaned to MTP to be used by MTP.  They were held from the possession of MTP by MTI with the intent MTI exercise control over the funds.

85.

The possession of the loaned funds by MTI was not authorized.

86.

Possession of the funds is being withheld from Q Apartments, which has a judgment for the loaned funds against MTP.

87.

MTI has asserted ownership of the funds by keeping them and not returning them to MTP from which they would be returned to Q Apartments.

## **PRAYER**

WHEREFORE, Plaintiff Q Apartments, respectfully prays that after due proceedings are had there be judgment in their favor and against Defendants for the following:

(1) that Defendants are liable to Q Apartments for violations of federal and state securities laws;

(2) that Thomson and Miller be held liable to Q Apartments for the amount lost in the loan to MTP for fraudulent and negligent misrepresentation;

(3) That Thomson, Miller and MTI be held liable for converting Q Apartments' property to themselves;

(4) consequential damages;

(5) attorneys' fees as provided by law;

(6) interest as provided by contract and law; and

(7) all appropriate relief under law and equity.

Respectfully submitted,

CARA STONE, LLP


*/s/ William F. Large*
William F. Large, Bar Roll No. 34837
201 Heymann Blvd., Suite 24
Lafayette, LA 70503
(504) 265-9955
wlarge@carastone.com

**Counsel for Plaintiff Q Apartments DK A/S**

**PLEASE PREPARE SERVICE AND SUMMONS:**

Miller Thomson Inc.
Miller Thomson & Partners, LLC
Roderick Thomson
Marsden Miller